**EXHIBIT D**

## PURCHASE AGREEMENT

PURCHASE AGREEMENT (the "Agreement") dated as of March 10, 1986 by and among Arvin Industries, Inc., an Indiana corporation ("Buyer"), Scovill Inc., a Delaware corporation ("Seller"), and Scovill Inc., a Connecticut corporation and an indirect subsidiary of Seller ("Old Scovill").

WHEREAS, Seller owns all of the issued and outstanding shares of capital stock of Schrader Automotive Inc., a Delaware corporation (the "Company") organized by Seller to conduct all of the businesses and operations formerly conducted by the Schrader Automotive Group, a division of Old Scovill (the "Schrader Automotive Division"), and to hold all of the assets and properties related to such businesses and operations (the "Business"); and

WHEREAS, on the basis of the representations and warranties, and subject to the terms and conditions, stated herein, Buyer desires to buy from Seller, and Seller desires to sell to Buyer, all of the issued and outstanding shares of capital stock of the Company (the "Shares") and Buyer further desires to buy from certain subsidiaries of Seller, and Seller desires to cause such subsidiaries to sell to Buyer, the balance (the "Balance") of the Business, some of which has not been transferred by Old Scovill to the Company (the "Acquisition").

NOW, THEREFORE, the parties hereto agree as follows:

### ARTICLE I

### Purchase and Sale

SECTION 1.1. (a) _Basic Transaction_. On the basis of the representations, warranties, covenants and agreements, and subject to the terms and conditions, stated herein, on the Closing Date (as hereinafter defined) (i) Seller will sell and Buyer will purchase the Shares owned by Seller and (ii) subject to Section 5.12 hereof, Seller and Old Scovill will cause to be sold and Buyer will purchase the Balance.

(b) _Purchase Price_. The purchase price for the Acquisition shall be an amount in cash equal to (i) "book value" of the Company as reflected on the pro forma consolidated balance sheet of the Company and the Company Subsidiaries

AM 000001

77

as of December 31, 1985 previously delivered to Buyer pursuant to Section 2.3 hereof, adjusted to reflect Seller's net capital contribution (or withdrawal) since the date of such balance sheet as certified by the Company's and Seller's chief financial officers in a separate certificate delivered to Buyer not less than two days prior to the Closing Date (the "Opening Balance Sheet"), plus (ii) to the extent reflected on such balance sheet, the amount of the Term Loan (as defined in Section 8.1(d) hereof), plus (iii) to the extent reflected on such balance sheet, the full amount of all liabilities arising out of or relating to the Scovill Inc. Retirement Plan for Salaried Employees, the Dickson Plant Hourly Employee Plan and Seller's post-retirement medical and life insurance program (the "Plan Liabilities"), minus (iv) $8,195,000 (collectively, the "Purchase Price"), which shall be subject to adjustment as set forth below.

(c) <u>Payment at Closing</u>. In full payment for the Shares and the Balance, subject to Section 5.12 hereof and other adjustments provided herein, Buyer will pay to Seller at the closing hereunder (the "Closing") an amount equal to the Purchase Price, <u>less</u> (i) the amount of the Term Loan (as defined in Section 8.1(d) hereof), which amount shall be contributed by Buyer to the Company as a capital contribution and shall be applied as set forth in Section 8.1(d) hereof, and (ii) $1,000,000, which amount Buyer shall deposit with Harris Trust and Savings Bank, as escrow agent (the "Escrow Agent"), pursuant to the provisions set forth in Section 4.4 hereof.

(d) <u>Adjustment to Purchase Price</u>. If "Net Book Value" (as defined in subsection (f) below) is less than the Purchase Price, Buyer shall, as soon as reasonably practicable following the "Determination Date" (as defined in subsection (e) below), direct the Escrow Agent pursuant to the terms of the Escrow Agreement to pay Buyer an amount out of the escrow fund in immediately available funds equal to the amount of any such deficiency with interest from the Closing Date through the date of payment on such amount at the prime rate of The First National Bank of Boston as in effect from time to time. If the amount of any such deficiency with such interest should exceed the amount comprising the escrow fund, Seller shall pay Buyer the remainder within five business days after the Determination Date in immediately available funds. If Net Book Value is greater than the Purchase Price, Buyer shall, within five business days of the Determination Date, pay Seller an amount in immediately available funds equal to the amount of any such excess with interest from the Closing Date through the date of payment on such

-2-

AM 000002

amount at the prime rate of The First National Bank of Boston as in effect from time to time.

(e) Procedure for Determining Net Book Value. As soon as reasonably practicable, and in any event within 60 days after the Closing Date, Seller will deliver to Buyer an audited pro forma consolidated balance sheet as of the Closing Date of the Company and the Company Subsidiaries setting forth Net Book Value (the "Closing Balance Sheet"), together with the report thereon of Deloitte Haskins & Sells, independent public accountants, and the consolidating balance sheet of the Company and the Company Subsidiaries as of such date. In preparing the Closing Balance Sheet, Seller will follow the accounting procedures and policies used in preparing the Company's December 31, 1985 audited financial statements (including any normal year-end adjustments thereof) delivered to Buyer pursuant to Section 2.3(b) hereof, and Seller may include net book value of (i) the equipment formerly used in the Company's Dickson, Tennessee plant and not currently in use in the operations of the Company, (ii) the "Red Alert" inventory and (iii) the tube valve products purchased from Brazil for sale to Goodyear included in the United States inventory, in each case, to the extent not previously written off or sold or otherwise disposed of, which amount shall not be subject to a claim that such assets are obsolete or excess. In addition, in preparing the Closing Balance Sheet, in the event the Parker Receivable (as defined in subclause (g) of this Section) has not been paid to Schrader S.A. (France) by the Closing Date, the Closing Balance Sheet shall not include the Parker Receivable. Seller will allow Buyer and Buyer's independent accountants to observe and review the preparation of the Closing Balance Sheet (including accountants' work papers). Within 45 days after Buyer's receipt of the Closing Balance Sheet and Deloitte Haskins & Sells' report, Buyer will provide Seller with a detailed statement describing its objections, if any, to the determination thereon of Net Book Value. If Buyer has any objections, Buyer and Seller will use reasonable efforts to resolve any disputes, but if a final resolution is not obtained within 30 days after Buyer has submitted its objections, any remaining disputes will be resolved by Coopers & Lybrand, independent public accountants, out of its office servicing Nashville, Tennessee. Buyer and Seller will share the fees and costs of such services of Coopers & Lybrand equally. The date on which Net Book Value is finally determined pursuant to the foregoing procedure is referred to herein as the "Determination Date."

(f) Definition of Net Book Value. "Net Book Value" will be determined as of the close of business on the Closing

-3-

AM 000003

Date and will be an amount equal to (i) "book value" of the Company as reflected on the Closing Balance Sheet determined in accordance with the procedure set forth in subsection (e) above, plus (ii) to the extent reflected on the Closing Balance Sheet, the amount of the Term Loan (as defined in Section 8.1(d) hereof), plus (iii) to the extent reflected on the Closing Balance Sheet, the full amount of all Plan Liabilities, minus (iv) $8,195,000.

(g) _Parker Receivable Adjustment_. (i)· To the extent the amount reflected on the Opening Balance Sheet as a receivable of Schrader S.A. (France) from a subsidiary of Parker Hannifin Corporation relating to the sale of certain assets of such subsidiary (the "Parker Receivable") has not been paid to Schrader S.A. (France) by the Closing Date, the Purchase Price payable at the Closing shall be reduced by such amount and Buyer shall pay to Seller at such time as such Parker Receivable is collected the net proceeds of the Parker Receivable, together with any additional net proceeds received from the subsidiary of Parker Hannifin Corporation in connection with its purchase of the assets giving rise to the Parker Receivable, based on the exchange rate in effect on such date of payment.

(ii) To the extent the Parker Receivable has been paid to Schrader S.A. (France) by the Closing Date, the Purchase Price payable at· the Closing shall be increased by the amount that the net proceeds received from the sale of assets of the subsidiary of Parker Hannifin Corporation exceeds net proceeds of the Parker Receivable, based on the exchange rate in effect on the Closing Date.

SECTION 1.2. _The Closing_. The Closing shall take place at the offices of Wachtell, Lipton, Rosen & Katz, 299 Park Avenue, New York, New York, on the later of (i) March 31, 1986 or (ii) the third business day after the conditions specified in Articles VI, VII and VIII hereof have been satisfied (the "Closing Date").


ARTICLE II

Representations and Warranties of Seller
and Old Scovill


Each of Seller and Old Scovill hereby represents and warrants as follows:


-4-


AM 000004

SECTION 2.1. Incorporation, Authorization, etc.
(a) The Company and each Company Subsidiary (as defined in Section 2.2 hereof) is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of incorporation. Each of such corporations (i) has full corporate power to own all of its properties and assets and to carry on its business as it is now being conducted; (ii) is duly qualified to do business and is in good standing, and is duly licensed, authorized or qualified to transact business, in each jurisdiction in which the ownership or lease of real property or the conduct of its business requires it to be so qualified, except where any failure to be so qualified individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole; and (iii) has all governmental licenses, permits, approvals and other authorizations necessary to own its properties and assets and carry on its business as it is now being conducted, except where the failure to have such licenses, permits, approvals and other authorizations individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole. The copies of the certificate of incorporation and by-laws (together with all amendments thereto) of the Company and the Company Subsidiaries, as in effect on the date hereof, to the extent previously delivered to Buyer, are complete and correct.

(b) Each of Seller and Old Scovill has full power and authority to execute, deliver and perform its obligations under this Agreement and, in the case of Seller, under the Escrow Agreement among Buyer, Seller and the Escrow Agent substantially in the form of Exhibit A hereto (the "Escrow Agreement"). This Agreement is the legal, valid and binding obligation of each of Seller and Old Scovill, enforceable against each of Seller and Old Scovill in accordance with its terms. When executed and delivered the Escrow Agreement will be the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(c) The execution and delivery of this Agreement does not, and the execution and delivery of the Escrow Agreement will not, and the consummation of the transactions contemplated hereby and thereby will not, violate any provision of the certificate of incorporation (or comparable charter document) or by-laws of the Company, any Company Subsidiary,

-5-

AM 000005

Case 3:07-cv-00927    Document 16-4    Filed 11/02/07    Page 6 of 46 PageID #: 595

Seller or Old Scovill or, except as set forth in Schedule
2.1, violate any provision of, or result in the passage of
time in a violation of, or result in the acceleration of or
entitle any party to accelerate (whether after the giving of
notice or lapse of time or both) any obligation under, or
result in the imposition of any lien upon or the creation of
a security interest in the stock or any assets or properties
of the Company or any Company Subsidiary pursuant to, any
mortgage, lien, lease, agreement, instrument, order, arbi-
tration award, judgment or decree to which Seller, Old Scovill,
or the Company or any Company Subsidiary is a party or by
which any of them is bound, and will not violate or conflict
with any other material restriction of any kind or character
to which Seller, Old Scovill, or the Company or any Company
Subsidiary is subject, except where such violation, accel-
eration, conflict, imposition of a lien or creation of a
security interest individually and in the aggregate would
not have a material adverse effect on the condition, finan-
cial or otherwise, of the properties, assets, liabilities,
rights, operations or business of the Company and the Company
Subsidiaries taken as a whole. Upon consummation of the
Acquisition at the Closing as contemplated by this Agreement,
Buyer will acquire title to all of the Shares and, subject to
Section 5.12 hereof, to the Balance, free and clear of any
liens, claims, charges, security interests, options or other
legal or equitable encumbrances. Other than in connection
with or in compliance with the provisions of Section 7A of
the Clayton Act and the rules and regulations thereunder (the
"Hart-Scott-Rodino Act") and the other required filings and
approvals set forth in Schedule 2.9B hereto, no notice to,
filing with or authorization, consent or approval of any
public body or authority by Seller, Old Scovill, or the Com-
pany or any Company Subsidiary is necessary for the consumma-
tion by Seller, Old Scovill and the Company of the transac-
tions contemplated by this Agreement and the Escrow Agreement.

SECTION 2.2. _Capitalization; Subsidiaries; etc._
The authorized capital stock of the Company consists of
15,000,000 shares of Common Stock, par value $.01 per share
(the "Common Stock"), and 500,000 shares of Preferred Stock,
par value $.01 per share. The Shares, which are comprised
of 100 shares of Common Stock, constitute all of the issued
and outstanding shares of capital stock of the Company. All
of the Shares are duly authorized, validly issued, fully paid
and nonassessable, and are owned of record and beneficially
by Seller. There are no outstanding obligations, options,
warrants or other rights of any kind to acquire shares of
capital stock of any class of the Company. Schedule 2.2
sets forth the name of each corporation or other entity in

-6-

AM 000006

which the Company owns, of record or beneficially, directly or indirectly, 50% or more of the outstanding capital stock or other equity interests (together with the entities consti- tuting the Balance discussed below, the "Company Subsidiar- ies"), its jurisdiction of incorporation or organization and the number of shares of its capital stock or other equity interests of each class which are issued and outstanding, and sets forth the record and beneficial owners of such shares or equity interests. Schedule 2.2 sets forth the entities constituting the Balance, the jurisdiction of incorporation or organization of each such entity, the number of shares of its capital stock or other equity interests which are issued and outstanding, and the record and beneficial owners, and the amount and percentage of ownership, of such shares or equity interests. For the purposes of this Agreement, the entities constituting the Balance shall be deemed to be Com- pany Subsidiaries. All of the issued and outstanding shares of capital stock or other equity interests of the Company Subsidiaries (other than shares of stock or equity interests in the Company Subsidiaries constituting the Balance not owned by the Company or Old Scovill) are duly authorized, validly issued, fully paid and nonassessable, and there are no out- standing obligations, options, warrants or other rights of any kind to acquire shares of capital stock or other equity interests of any of the Company Subsidiaries. Except as set forth in Schedule 2.2, the Company's shares of capital stock or other equity interests of each class of each Company Sub- sidiary are owned free and clear of any liens, claims, charges, security interests, options or other legal or equitable encum- brances. Neither the Company nor any Company Subsidiary has any equity investment in any corporation, association, part- nership, joint venture or other entity except as set forth in Schedule 2.2, and all of such investments are owned free and clear of any liens, claims, charges, encumbrances, restric- tions on voting or alienation or any other limitation except as disclosed in Schedule 2.2. Except as set forth in Sched- ule 2.2, (i) the Company and the Company Subsidiaries are the only companies or entities which Seller or Old Scovill or any of their affiliates have an investment in that conduct the operations of the Business and (ii) none of the Company or the Company Subsidiaries conduct operations other than the opera- tions of the Business. Schedule 2.2 contains all businesses or entities whose assets or results of operations are reflect- ed on (either directly or through equity accounting) or in- cluded in the Company's Financial Statements (as defined in Section 2.3(a) hereof). If the registered capital with respect to the Company's ownership of the stock of Valvulas Schrader do Brasil, a Brazilian Company Subsidiary, as ulti- mately determined by the Central Bank of Brazil with respect

-7-

AM 000007

to the application previously filed by Old Scovill, is less
than $5 million, then the Purchase Price will be reduced by
the full amount of such deficiency. If the amount of such
registered capital deficiency is determined after the Deter-
mination Date, Seller shall pay the full amount of such ad-
justment in the Purchase Price, if any, to Buyer in immedi-
ately available funds within five business days following
such determination of registered capital, or, at Buyer's op-
tion, Buyer may exercise its right to draw upon escrow funds
in respect of such amount in accordance with the provisions
set forth in Section 4.4 hereof.

SECTION 2.3. _Financial Statements; Product Warran-
ties; etc._ (a) Seller has previously delivered to Buyer
true and complete copies of the pro forma consolidated balance
sheet of the Company and the Company Subsidiaries as of Dec-
ember 31, 1985 and the related consolidated statement of income
for the 11 months ended December 31, 1985, certified by Seller's
and the Company's chief financial officers (collectively, the
"Company's Financial Statements"), and the consolidating bal-
ance sheet of the Company and the Company Subsidiaries as of
December 31, 1985 and the related consolidating statement of
income for the 11 months ended December 31, 1985, certified
by the Company's and Seller's chief financial officers (the
"Consolidating Financial Statements").

(b) By not later than March 28, 1986, Seller will
deliver to Buyer true and complete copies of the audited pro
forma consolidated balance sheet of the Company and the Com-
pany Subsidiaries as of December 31, 1985 and the related
audited consolidated statements of income, retained earnings
and changes in financial position for the 11 months ended
December 31, 1985, together with the report thereon of Deloitte
Haskins & Sells, independent public accountants, and the con-
solidating balance sheet of the Company and the Company Subsid-
iaries as of December 31, 1985 and the related consolidating
statements of income, retained earnings and changes in finan-
cial position for the 11 months ended December 31, 1985 used
in the preparation of the audited consolidated financial state-
ments referred to in this subsection (b), certified by the
Company's and Seller's chief financial officers. In addition,
Seller will deliver to Buyer true and complete copies of such
1985 financial statements of the Company and the Company Subsid-
iaries as are required to be filed by Buyer with the Securities
and Exchange Commission on a Current Report on Form 8-K pursu-
ant to the Securities Exchange Act of 1934, as amended.

(c) Seller has previously delivered to Buyer true
and complete copies of the consolidated balance sheet of Seller

-8-

AM 000008

as of December 31, 1985 and the related consolidated state-
ments of income, retained earnings and changes in financial
position for the 11 months ended December 31, 1985, certified
by Seller's chief financial officer (collectively, "Seller's
Financial Statements").

(d)  Each of the Company's Financial Statements,
the audited consolidated financial statements referred to in
subsection (b) above, the Closing Balance Sheet and Seller's
Financial Statements were or will be prepared in accordance
with generally accepted accounting principles on a basis con-
sistently applied during the periods covered, except as other-
wise provided in Section 1.1(e)(i)-(iii) hereof to the extent
the products identified in such Section are deemed obsolete or
excess, and present fairly the financial position, results of
operations or other information included therein of the Company
(including the Company Subsidiaries) and Seller, respectively,
for the periods or as of the dates therein set forth, subject,
where appropriate, to normal year-end adjustments, in each
case in accordance with generally accepted accounting princi-
ples consistently applied during the periods covered.  The
Company's Financial Statements and the Closing Balance Sheet
have been or will be prepared on a basis consistent with the
Company's audited consolidated financial statements referred
to in subsection (b) above.  Each of the Consolidating Financial
Statements was prepared in accordance with generally accepted
accounting principles on a basis consistently applied during
the periods covered, except as otherwise provided in Section
1.1(e)(i)-(iii) hereof to the extent the products identified
in such Section are deemed obsolete or excess, and was used by
Seller and the Company in the preparation of the Company's
Financial Statements.

(e)  Seller has previously delivered to Buyer a true
and complete copy of the standard terms and conditions of sale
or lease of products ("Sales Contracts") for each of the Com-
pany and the Company Subsidiaries (containing applicable war-
ranty provisions).  The Sales Contracts accurately reflect
the rates generally in effect as of the date hereof and the
standard warranty provisions generally applicable to such
Sales Contracts.

SECTION 2.4.  Title; Condition of Properties.  (a)
Except for liens for current taxes not yet delinquent, except
as set forth in Schedule 2.4A, and, with respect to real pro-
perty, except for ordinances, laws and other governmental
regulations and restrictions, the Company, or one of the
Company Subsidiaries, has, with respect to personal property,
good and marketable title, and, with respect to real property,

-9-

AM 000009

insurable fee simple title (or, with respect to properties where such insurance is not available and properties outside the United States, the equivalent thereof), in each case, free and clear of any liens, claims, charges, options or other title defects or encumbrances (except where such liens, claims, charges, options or other title defects or encumbrances individually and in the aggregate would not have a material adverse effect upon the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole), to each material piece of real and personal (tangible and intangible) property reflected on (either directly or through equity accounting) or included in the Opening Balance Sheet, and to each material piece of real and personal (tangible and intangible) property acquired by the Company and the Company Subsidiaries since the date of the Opening Balance Sheet, except such properties as have been disposed of since such date which, if disposed of after the date hereof, such disposal would be permitted by Section 5.5 hereof; such real and personal property is hereinafter referred to as the "real property" and the "personal property," respectively, or collectively as the "property."

(b) Schedule 2.4B contains a complete and accurate summary list of each item of personal property of the Company and the Company Subsidiaries (except for any items of such property having a book value as of the date hereof of less than $50,000) and contains a summary description thereof including (where appropriate) any serial number or other designation of such personal property.

(c) Schedule 2.4C (i) contains a complete and accurate summary list of each piece of real property of the Company and the Company Subsidiaries, including the approximate acreage of each parcel of such real property, the location thereof, the use to which it is put by the Company and/or any Company Subsidiary and the nature of any improvements thereon, and (ii) lists and summarizes the principal terms of all title insurance policies, if any (true and complete copies of which have previously been delivered to Buyer), covering any such property and all easements, encumbrances, covenants, restrictions and interests granted with respect to such real property since the issuance of such title insurance policies (true and complete copies of which have previously been delivered to Buyer).

(d) The buildings and operations of the Company and the Company Subsidiaries (i) conform in all material respects with all applicable restrictive covenants, deeds and

-10-

AM 000010

restrictions and all applicable foreign, federal, state and local laws, ordinances, rules and regulations (including those relating to zoning and environmental protection), except where the failure so to conform individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole, and (ii) do not encroach upon, and are not encroached upon by, property of others except where such encroachments individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole. The Company, or one of the Company Subsidiaries, has a valid and binding lease on each piece of leased real property listed in Schedule 2.4C (a complete copy of each such lease having previously been delivered to Buyer), which constitutes all real property leased by the Company and the Company Subsidiaries under a lease providing for annual rentals in excess of $50,000; the tenant under each such lease is now in possession of such leased real property; Seller has no knowledge of any default under any such lease by any other party thereto which default, either individually or in the aggregate, would have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole; there is no pending or, to the best of Seller's knowledge, threatened proceeding which might interfere with the quiet enjoyment of the tenant under any such lease in a manner which would have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole. The Company and the Company Subsidiaries have among them adequate permanent rights of ingress to and egress from all real property used or intended to be used in the business or operations of the Company and the Company Subsidiaries. All buildings, machinery and other equipment which are material to and used by the Company and the Company Subsidiaries in connection with their respective businesses or operations are in good and serviceable condition for the purposes for which they are being employed, reasonable wear and tear excepted. Such buildings, machinery and other equipment are adequate to conduct the business and operations of the Company and the Company Subsidiaries as presently conducted.

-11-

AM 000011

SECTION 2.5.  Compliance with Laws.  Each of the Company and the Company Subsidiaries has complied in all respects with applicable laws and regulations of federal, state, local and foreign governments and agencies thereof, and no claim has been filed against any of the Company and the Company Subsidiaries alleging a violation of any such law or regulation, except where the failure so to comply or such violation individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.  In particular, but without limiting the generality of the foregoing,  neither the Company nor any Company Subsidiary has (i) violated in any material respect or received a notice or charge asserting any violation of the Occupational Safety and Health Act of 1970, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, the Resource Conservation and Recovery Act of 1976, the Toxic Substances Control Act of 1976 or any other federal, state, local or foreign law, including rules and regulations thereunder, regulating or otherwise concerning employee health and safety or the environment; (ii) disposed of any substance in any manner which may form the basis for any material claim, demand or action seeking cleanup of any site, location or body of water, surface or subsurface; (iii) violated in any material respect or received a notice or charge asserting any possible violation of the Sherman Act, the Clayton Act, the Robinson-Patman Act or the Federal Trade Commission Act; or (iv) violated, or received any notice of violation or charge asserting any violation of, or received any inquiry concerning any possible violation of, the Foreign Corrupt Practices Act, the Anti-Boycott Act or the Consumer Product Safety Act; in each case, except where such violations or claims individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.

SECTION 2.6.  Changes Since December 31, 1985.  Except as set forth in Schedule 2.6, since December 31, 1985, there has not been:

(a)  any material adverse change in the present or contemplated future business, results of operations or financial condition of the Company or of any Company Subsidiary from that shown in the Company's Financial Statements;

-12-

AM 000012

(b) any material decrease, or change which Seller reasonably believes could result in a material decrease, in the revenues of the Company and the Company Subsidiaries from the corresponding period of the fiscal year ended December 31, 1985;

(c) any change in any of the assets, licenses, permits or franchises of the Company or any Company Subsidiary which is material to the present or contemplated future business, results of operations or condition (financial or otherwise) of the Company or any Company Subsidiary, or any change in the nature of the business, methods of accounting or accounting practice, or manner of conducting business, all or any of which have had or may reasonably be expected to have a material adverse effect on the business, results of operations, condition (financial or otherwise), prospects, assets, licenses, permits or franchises of the Company and the Company Subsidiaries taken as a whole;

(d) any damage, destruction or other casualty loss (whether or not covered by insurance) individually or in the aggregate materially and adversely affecting the present or contemplated future business, results of operations or condition (financial or otherwise) of the Company and the Company Subsidiaries taken as a whole;

(e) any amendment, modification or termination of any existing, or entering into any new, contract, agreement, plan, lease, license, permit or franchise all or any of which is material to the present or contemplated future business, results of operations or condition (financial or otherwise) of the Company and the Company Subsidiaries taken as a whole;

(f) any increase in the rate of compensation or in the benefits payable or to become payable to any officer or other employee of the Company or any Company Subsidiary over the levels in effect at December 31, 1985, other than increases required by union contracts or by applicable law or increases consistent with past practice payable to individuals whose annual level of compensation and benefits (after giving effect to such increase) is less than $50,000;

(g) any loan to or any other transaction (whether or not discharged or consummated) with any officer, director or shareholder of the Company or any Company Subsidiary or any affiliate of Seller or Old Scovill giving rise to any claim or right of the Company or any Company Subsidiary against any such person or of any such person against the Company or

-13-

AM 000013

any Company Subsidiary (except for intercompany indebtedness which will be settled pursuant to Section 5.9 hereof within 30 days after the Closing Date);

(h)  any disposition by the Company or by any Company Subsidiary of any asset other than as permitted by this Agreement or other than in the ordinary course of business; or

(i)  any direct or indirect redemption, purchase or other acquisition of any stock of any class of the Company or any Company Subsidiary or any declaration, setting aside or payment of any dividend or other distribution on or in respect of stock of any class of the Company or of any Company Subsidiary.

SECTION 2.7.  <u>Litigation; Orders</u>.  Except as disclosed in Schedule 2.7, there are no lawsuits, actions, administrative or arbitration or other proceedings or governmental investigations pending or, so far as is known to Seller, threatened against the Company or any Company Subsidiary which could result in a judgment against the Company or any Company Subsidiary which, either individually or in the aggregate, could have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.  With respect to all lawsuits, actions, administrative or arbitration or other proceedings or governmental investigations pending on or prior to the date hereof or arising out of events occurring on or prior to the Closing Date, including but not limited to any such lawsuit, action, proceeding or investigation relating to or arising out of the operations of the Company Subsidiary in Ecuador, Seller shall indemnify and hold harmless Buyer, the Company and the Company Subsidiaries from, against and in respect of any judgments, awards, costs, damages, penalties, fines, expenses and fees (including court costs and reasonable attorneys' fees) arising out of such matters, to the extent not reserved against on the Closing Balance Sheet, and Buyer, the Company and the Company Subsidiaries shall have the right to draw upon escrow funds with respect thereto in accordance with the provisions set forth in Section 4.4 hereof.  The limitations and provisions contained in Sections 4.1, 4.2 and 4.3 hereof shall apply to the foregoing indemnity.  There are no judgments or outstanding orders, injunctions, decrees, stipulations or awards (whether rendered by a court or administrative agency, or by arbitration) against the Company or any Company Subsidiary or against any of their respective properties or businesses which may have the effect of prohibiting any business practice or the acquisition of

-14-

AM 000014

any property or the conduct of any business by the Company or any Company Subsidiary or which, either individually or in the aggregate, would have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.

SECTION 2.8. Patents, Trademarks, etc. Schedule 2.8 contains a brief description of all patents, copyrights, trade names, trademarks and similar rights owned by or registered in the name of the Company or any Company Subsidiary or used in the business of the Company or any Company Subsidiary (collectively, "trade rights"). The Company and the Company Subsidiaries among them possess adequate and enforceable long-term licenses or other rights to use (without payment, except as specified in Schedule 2.8) all such trade rights, including, without limitation, except as set forth in Schedule 2.8, the right to use the names "Schrader" and "Schrader Automotive", and have not received any notice of conflict which asserts the rights of others with respect thereto. The Company and each Company Subsidiary has in all respects performed all the obligations required to be performed by it, and is not in default in any respect, under any agreement relating to any trade right, except where the failure so to perform or such default individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.

SECTION 2.9. Licenses, Approvals and Other Authorizations; Consents; Reports. (a) Schedule 2.9A contains a complete and accurate list and description of all material governmental licenses, permits, approvals and other authorizations used or required by the Company and the Company Subsidiaries in the conduct of their businesses. Except as disclosed in Schedule 2.9A, no proceeding is pending, or, so far as is known to Seller, is threatened, seeking the revocation or limitation of any such license, permit, order or other authorization and, so far as is known to Seller, there is no basis or ground for any such revocation or limitation, except where any such revocation or limitation individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.

(b) Schedule 2.9B contains a list of all material registrations, filings, applications, notices, transfers,

-15-

AM 000015

consents, approvals, orders, qualifications, waivers and other actions of any kind required of any persons or governmental authorities or private agencies in connection with the consummation of the Acquisition. The conduct of the businesses of the Company and the Company Subsidiaries complies in all material respects with all applicable laws, governmental licenses, permits, orders and other authorizations (local or foreign) which are applicable thereto, except where the failure so to comply individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole; and, except as set forth in Schedule 2.9B, each license, permit, order and other authorization (local or foreign) which is material to the business, assets, financial condition, prospects or results of operations of the Company or any Company Subsidiary has been obtained and is in full force and effect, and will not cease to remain in full force and effect in accordance with its terms by reason of the Acquisition.

SECTION 2.10. <u>Labor and Equal Employment Opportunity Matters</u>. No material work stoppage against the Company or any Company Subsidiary is pending or, to the best knowledge of Seller, threatened. Except as set forth in Schedule 2.10, neither the Company nor any Company Subsidiary is involved in, or, to the best knowledge of Seller, is threatened with or affected by, any labor dispute, arbitration, lawsuit or administrative proceeding relating to labor or equal employment opportunity matters. Except as set forth in Schedule 2.10, the employees of the Company and the Company Subsidiaries are not represented by any labor union nor are there any collective bargaining agreements otherwise in effect with respect to such employees. Except as set forth in Schedule 2.10, there is no pending or, to the best knowledge of Seller, threatened claim or litigation against the Company or any Company Subsidiary alleging any violation of any state or federal law, rule or ordinance relating to equal employment opportunity matters.

SECTION 2.11. <u>Liabilities</u>. Except as set forth in Schedule 2.11 or any other Schedule to this Agreement, neither the Company nor any Company Subsidiary has any obligation or liability of a type required to be reflected on a balance sheet or in the notes thereto consistent with generally accepted accounting principles, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, secured or unsecured, other than:

-16-

AM 000016

(a) liabilities disclosed or provided for in the Opening Balance Sheet; and

(b) liabilities incurred in the ordinary course of business since December 31, 1985, none of which, either individually or in the aggregate, has been or may reasonably be expected to be materially adverse to the business, assets, condition (financial or otherwise), prospects or results of operations of the Company and the Company Subsidiaries taken as a whole.

SECTION 2.12.  Contracts, Agreements, etc.  Except as set forth in Schedule 2.12, neither the Company nor any Company Subsidiary is a party to or subject to any of the following:

(a) any agent's, salesman's, broker's, dealer's, distributor's franchise, subcontractor's or manufacturer's representative contract or similar agreement, arrangement or understanding, whether written or oral, express or implied, or having any other basis, with respect to the manufacture, sale or distribution of products of, or furnishing of services by, the Company or any Company Subsidiary which is not terminable on notice of 30 days or less without penalty or other financial obligation;

(b) any employment or consultation agreement, or other compensation contract, commitment or arrangement, including but not limited to any union contract or collective bargaining agreement, whether written or oral, express or implied, or having any other basis (except for contracts included in Schedule 2.10 or Schedule 2.16) which involve annual payments in excess of $50,000 and which are not terminable on notice of 30 days or less without penalty or other financial obligation (except as set forth in Schedule 2.12, no officer or employee of the Company or any Company Subsidiary receives total salary and other compensation from the Company and the Company Subsidiaries of $50,000 or more per annum);

(c) any plan (except as included in Schedule 2.10 or Schedule 2.16) or any contract or arrangement, oral or written, or any statutory obligation providing for bonuses, pensions, options, deferred compensation, retirement payments, profit sharing or the like;

(d) any lease or other agreement or arrangement for the use of machinery, equipment or personal property involving payment of annual rentals in excess of $25,000;

-17-

AM 000017

(e) any contract, agreement, arrangement, license or permit which restricts the payment of dividends by any Company Subsidiary;

(f) any contract, agreement, arrangement or license with respect to which payments are denominated in a foreign currency (excluding contracts of a type set forth in the other subsections of this Section 2.12) or with respect to which currency exchange rates are fixed otherwise than at a fluctuating freely available market rate involving aggregate annual payments in excess of $50,000;

(g) any contract, agreement or arrangement with Seller or with any affiliate (other than the Company or a Company Subsidiary) of Seller;

(h) any insurance policies (other than title insurance policies relating to the real property described in Schedule 2.4, which policies are listed in said Schedule) naming the Company or any Company Subsidiary as an insured or beneficiary or as a loss payable payee, or for which the Company or any Company Subsidiary has paid all or part of the premium in force as of the date of this Agreement (Schedule 2.12 contains a complete and accurate summary of the principal terms of each listed insurance policy, including the type of insurance, vendor, coverage amount and annual premium);

(i) any instrument or agreement relating to indebtedness by way of lease-purchase arrangements, conditional sale, guarantee or other undertakings on which others rely in extending credit, any material joint venture agreements or any material chattel mortgages and other security arrangements, with respect to material personal property and equipment used by the Company or any Company Subsidiary;

(j) any contract containing covenants limiting the freedom of the Company or any Company Subsidiary or of any of their respective employees to compete in any line of business presently conducted by the Company or any Company Subsidiary with any person or to compete in any such line of business in any area;

(k) any license agreement, either as licensor or licensee (except as included in Schedule 2.8);

(l) any contract or option for the purchase or sale of real property;

(m) any contract, agreement or instrument relating to indebtedness for borrowed money in excess of $250,000;

-18-

AM 000018

(n)  any contract, agreement or commitment for capital expenditures in excess of $50,000;

(o)  any other contracts (including sales and purchase orders), whether written or oral, express or implied, or having any other basis, except those which (i)(A) were made in the ordinary course of business, or (B) are terminable on 30 days' or less notice by the Company or a Company Subsidiary without penalty or other financial obligation, and (ii) involve aggregate annual payments by or to the Company or any Company Subsidiary in excess of $50,000.

Except as set forth in Schedule 2.12, neither the Company nor any Company Subsidiary nor, so far as is known to Seller, any other party to any such contract, agreement, plan, lease, license or permit, has breached any material provision of, or is in default in any respect under the terms of, any such contract, agreement, plan, lease, license or permit, except where such breach or default individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.  Except as set forth in Schedule 2.9B, (i) all such contracts, agreements, plans, leases, licenses and permits are valid, binding and in full force and effect and will continue to be in full force and effect without change following the Acquisition without obtaining the consent of any other party thereto, subject, in the case of parties other than the Company and the Company Subsidiaries, to bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights generally and by laws of general application limiting the availability of equitable remedies, and (ii) subject to the receipt of consents referred to in Schedule 2.9B, the execution and delivery of this Agreement by Seller and the consummation of the transactions and agreements contemplated hereby will not violate any provision of, or result in the acceleration of any obligation under or the termination of, any such contract, agreement, plan, lease, license or permit, except where such violation, acceleration or termination individually and in the aggregate would not have a material adverse effect on the condition, financial or otherwise, of the properties, assets, liabilities, rights, operations or business of the Company and the Company Subsidiaries taken as a whole.

SECTION 2.13.  Material Interests of Certain Persons.  Except as set forth in Schedule 2.13, neither Seller, nor First City Industries Inc., a Delaware corporation ("First

-19-

AM 000019

City"), nor any of the officers or directors of the Company or any Company Subsidiary has any material interest in (i) any contract, arrangement or understanding with, or relating to, the business or operations of, the Company or any Company Subsidiary, or (ii) any property (real or personal), tangible or intangible, used or intended to be used in, or pertaining to, the business or operations of the Company or any Company Subsidiary which, either individually or in the aggregate, is material to the business, results of operations or financial condition of the Company and the Company Subsidiaries taken as a whole.

SECTION 2.14. <u>Intercompany Accounts</u>. Schedule 2.14 sets forth all intercompany accounts between the Company and the Company Subsidiaries, on the one hand, and Old Scovill, Seller and their subsidiaries (other than the Company and the Company Subsidiaries) and affiliates, on the other hand. Except as set forth in Schedule 2.14, neither the Company nor any Company Subsidiary owes or is owed money or other property to or by Seller, Old Scovill and any of their subsidiaries (other than the Company and the Company Subsidiaries) and affiliates.

SECTION 2.15. <u>Taxes</u>. The Company and each Company Subsidiary has timely filed or will timely file (or, where permitted or required, their respective direct or indirect parent has timely filed or will timely file) all federal, state, local and foreign tax returns and filings required by applicable law to be filed by any of them for all taxable periods ended or ending on or before the Closing Date and has paid (or there has been paid on its behalf) or, where payment is not yet required to be made, has set up an adequate accrual for the payment of, all taxes required to be paid in respect of the periods covered by such returns and filings. With respect to all taxable periods starting on or prior to the Closing Date but ending subsequent to the Closing Date, the Company and each Company Subsidiary have set up or will set up on the Closing Balance Sheet an adequate accrual for the payment of all taxes required to be paid with respect to those periods. For purposes of the preceding sentences, all tax periods which began prior to the Closing Date and, absent consummation of the transactions contemplated by this Agreement, would have ended after the Closing Date shall be treated as ending on the Closing Date. The tax returns and filings filed (or to be filed) for periods ending after December 31, 1985 were prepared (or will be prepared) on a basis consistent with prior periods except as required by changes in the law. As of the date hereof, neither the Company nor any Company Subsidiary had any liability with respect to any such taxes, including but not limited to interest

-20-

AM 000020

and/or penalties, for any periods, in excess of the amount so paid or the accrual so established therefor on the Opening Balance Sheet. Neither the Company nor any Company Subsidiary is delinquent in the payment of any tax, assessment or governmental charge required to be paid by it. No election under Section 341(f) of the Internal Revenue Code of 1954, as amended (the "Code"), has been or shall hereafter be made to treat the Company or any Company Subsidiary as a consenting corporation (as defined in Section 341(f) of the Code). Except for reasonable actions undertaken in good faith consistent with tax accounting principles, no action shall hereafter be taken by Seller or any affiliate of Seller which action shall result in any increase in tax liability for the Company or any Company Subsidiary with respect to any taxable period ending after the Closing Date. Except as set forth in Schedule 2.15, no deficiencies for any tax, assessment or governmental charge have been proposed (tentatively or definitively), asserted or assessed against the Company or any Company Subsidiary and there is no basis for any such deficiency, assessment or charge. Neither the Company nor any Company Subsidiary has executed and not revoked any request for waiver or extension of the time to assess any tax. None of the federal income tax returns of the Company or any Company Subsidiary have been audited by the Internal Revenue Service. Except as set forth in Schedule 2.15, no foreign tax audits by a governmental authority of the Company or any Company Subsidiary in respect of any taxable period are pending and no such foreign tax audits have been conducted in respect of any taxable period ending after December 31, 1980. True and complete copies of the 1984 foreign Company Subsidiaries' tax returns and all attachments thereto have previously been, or prior to Closing will be, delivered to Buyer. Seller shall provide to Buyer as soon as practicable following the Closing Date, but in no event later than September 30, 1986, information, complete and accurate in all material respects, relating to the tax basis (United States, in the case of the Company, and foreign, in the case of the Company Subsidiaries) of each of the assets of the Company and the Company Subsidiaries. There have been no audits of the state or local income or franchise tax liabilities of the Company since December 31, 1980. For the purposes of this Agreement, the term "tax" shall include all federal, state, local and foreign taxes and all interest and penalties thereon.

The following items shall be payable by Seller, Seller shall indemnify and hold harmless Buyer from and against and Buyer may, at its option, exercise its right to draw upon escrow funds in accordance with the provisions set forth in Section 4.4 hereof in respect of (a) any tax payable with respect to any

-21-

AM 000021

tax return or filing for any taxable period ending on or prior to or including the Closing Date in excess of the accrual on the Closing Balance Sheet for such tax for such period as set forth above, (b) any tax deficiencies, including interest and penalties, arising from any audit by any tax authority with respect to any period ending on or prior to or including the Closing Date in excess of the accrual on the Closing Balance Sheet for any such deficiencies, and (c) any reasonable accountant's and attorney's fees and court costs which become payable by Buyer in connection with the contest of any such tax or tax deficiency, provided that all of the foregoing shall be subject to the limitations and provisions set forth in Sections 4.1, 4.2 and 4.3 hereof.

Notwithstanding the foregoing, (a) Buyer agrees to indemnify and hold harmless Seller and its affiliates from and against any and all taxes and any other liability, including related costs and expenses (including reasonable attorney's fees) caused by, or arising from (i) any election made or deemed to be made by Buyer pursuant to Section 338 of the Code (or any similar election under state or local income tax law) with respect to the sale of the Shares pursuant to this Agreement, or (ii) any sale of assets by the Company on the Closing Date which sale is completed after the Closing hereunder; and (b) Seller agrees to indemnify and hold harmless Buyer and its affiliates (without regard to the limitations set forth in Section 4.2 hereof) from, against and in respect of any and all taxes and any other liability, including related costs and expenses (including reasonable attorneys' fees), caused by or arising out of any election made or deemed to be made by Seller or any of its affiliates pursuant to Section 338 of the Code (or any similar election under state or local income tax law) with respect to Seller's acquisition of Old Scovill and Old Scovill's affiliates. Buyer shall cause the Company and the Company Subsidiaries to provide any consent or to take any other action which may be required in order for Seller to make a protective carryover election (within the meaning of Section 1.338-4T(f)(6) of the temporary regulations promulgated under Section 338 of the Code) with respect to the acquisition by Seller and its affiliates of Old Scovill; _provided_, _however_, that Seller shall reimburse Buyer for any out-of-pocket cost incurred by Buyer, the Company or any Company Subsidiary with respect to the foregoing.

SECTION 2.16. _Employee Benefit Plans_. (a) Schedule 2.16, which Seller has previously delivered to Buyer, contains a written list of all employee benefit plans and all collective bargaining agreements relating to employee benefits with respect to which, as of and subsequent to the Closing,

-22-

AM 000022

the Company or any Company Subsidiary will have or may incur any future or contingent obligations or liabilities, including, without limitation, all plans, agreements or arrangements relating to deferred compensation, pensions, profit sharing, retirement income or other benefits, stock purchase and stock option plans, bonuses, severance arrangements, health benefits, insurance benefits and all other employee benefit or fringe benefits (collectively, exclusive of the Enumerated Plans referred to in subsection (d) below, the "Plans"). Seller has furnished to Buyer complete and correct copies of all Plans. Except as set forth in Schedule 2.16 hereto, no Plan is a "pension plan" within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including, without limitation, a multi-employer plan within the meaning of Section 4001(a)(3) of ERISA.

(b) Each Plan has been administered and operated in all material respects in accordance with its terms and applicable law. No liability under ERISA or otherwise has been incurred and, based upon existing facts, may be expected to be incurred with respect to any Plan, which liability, individually or in the aggregate, would materially and adversely affect the business, results of operations or financial condition of the Company and the Company Subsidiaries taken as a whole. The liabilities, contingent or otherwise, relating to or arising out of each of the Plans, do not, with respect to each Plan, exceed the assets of each such Plan, except with respect to the Canadian and Monroe, North Carolina Plans. All assets and liabilities of the Plans of the Company will be transferred to the Company at the Closing. To the extent that the assets of any Plan cover employees other than employees of the Company and the Company Subsidiaries (including the Balance Company Subsidiaries), the assets and the liabilities relating to employees of the Company and the Company Subsidiaries shall be segregated from such Plan and transferred to the Plan established by the Company in accordance with the requirements of ERISA and applicable Canadian law as the case may be.

(c) Except for amendments or modifications required by law, no Plan has been amended and the actuarial assumptions in respect of any Plan have not been changed within the 12 months preceding the date hereof, no actuarial assumptions in respect of any Plan shall be changed on or after the date hereof and no Plan shall be amended on or after the date hereof to increase any benefits which may be payable under any Plan.

(d) Buyer specifically does not assume any obligation or liability arising out of or relating to any of the

-23-

AM 000023

Scovill Inc. Retirement Plan for Salaried Employees, the Dickson Plant Hourly Employee Plan and Seller's post-retirement medical and life insurance program (collectively, the "Enumerated Plans"). To the extent any liability, including attorneys' fees and court costs, if any, becomes payable by Buyer, the Company or any Company Subsidiary which liability relates to or arises out of (i) any of the Enumerated Plans, or (ii) any claims relating to health, medical and death benefits which relate to employment or events occurring on or prior to the Closing Date or which arise out of health or medical related services (in respect of such claims) provided on or prior to the Closing Date, irrespective of when the claims in respect thereof are made (except for claims relating to health, medical and death benefits provided by any foreign Company Subsidiary to the extent the Company receives payment or reimbursement with respect to such claims under an insurance policy of the Company or the Company Subsidiary in effect prior to the Closing and in full force and effect as of the Closing Date, excluding legal expenses, if any, not covered by such payment or reimbursement), then, and in any such case, Seller agrees to indemnify and hold harmless Buyer, the Company and Company Subsidiaries from, against and in respect of, and Seller shall, upon the demand of Buyer, pay Buyer, the Company or such Company Subsidiary the amount of, any such liability or Buyer may, at its option, exercise its right to draw upon escrow funds in respect of such amount in accordance with the provisions set forth in Section 4.4 hereof; provided, however, that Seller shall have no liability with respect to the items referred to in clause (ii) above for any health or medical related services rendered after July 31, 1986.

SECTION 2.17. _Insurance_. The Company and the Company Subsidiaries have in full force and effect insurance on their properties and assets to insure against such risks, in such amounts and to such extent as would be carried by a prudent person possessing or operating like or similar properties and assets in a profitable business. Seller shall maintain or cause to be maintained in full force and effect all such insurance policies through the Closing Date.

SECTION 2.18. _French Severance Pay_. Pursuant to the Stock Purchase Agreement (the "Parker Agreement") dated June 26, 1985 between Parker Hannifin Corporation ("Parker"), Seller and Old Scovill, Parker has agreed to accept liability for and to pay the severance pay of certain employees terminated by Schrader S.A. (France) as a result of the departure of Schrader Bellows. True and complete copies of the Parker Agreement, insofar as such agreement relates to severance liabilities, have previously been delivered to Buyer. In any event, Seller agrees to indemnify and hold harmless Buyer,

-24-

AM 000024

the Company and the Company Subsidiaries from, against and in respect of any liability which arises out of or relates to the termination of in excess of 30 employees of Schrader S.A. (France) in connection with or otherwise caused by the departure of Schrader Bellows.

SECTION 2.19.  Services.  Except for certain services set forth in Schedule 2.19, Seller provides no services (including, without limitation, administrative, personnel, bookkeeping, computer, sales, shipping or marketing services) to the Company or the Company Subsidiaries.  With respect to the services provided by Seller to the Company or the Company Subsidiaries, other than banking services, Seller, at the request of Buyer or the Company, shall enter into, and cause any of its affiliates as Buyer or the Company shall specify to enter into, reasonable service agreements as may be necessary to effect the orderly transition.of the Business to Buyer's control.  Such agreements shall provide Buyer and the Company with the right to terminate their obligations thereunder at any time upon thirty (30) days written notice.

SECTION 2.20.  Exclusion of Dickson Plant.  As of the Closing Date, the Company and the Company Subsidiaries will not own, and the Balance will not include the Dickson, Tennessee plant formerly operated by the Schrader Automotive Division, and, in any event, Buyer is not assuming any liability or obligation arising out of or relating to the business and operations of the Dickson, Tennessee plant of the Schrader Automotive Division, and all liabilities (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, secured or unsecured) associated with the Dickson, Tennessee plant.

SECTION 2.21.  Release as Co-Guarantor.  Subject to and as of the Closing hereunder, the Company will be released from any and all obligations and liabilities it has or may have as a joint and several co-guarantor under the indentures pursuant to which Seller's $125,000,000 14-1/2% Senior Subordinated Notes due 1995 and Seller's $75,000,000 16% Subordinated Debentures due 1999 are issued.

SECTION 2.22.  Hong Kong Equipment.  An adequate reserve has been set up on the Opening Balance Sheet for all equipment owned by the Company or any Company Subsidiary which is located in Hong Kong and which is not currently being used.

SECTION 2.23.  Disclosure.  No representation, warranty or statement made by Seller and/or Old Scovill in this Agreement or in the Schedules and Exhibits attached hereto or

-25-

AM 000025

in the certificates furnished to Buyer pursuant to this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein, in light of the circumstances under which they were made, not misleading.

SECTION 2.24. Brokers, Finders, etc. Neither Seller, nor Old Scovill nor any of their affiliates has employed, or is subject to any claim of, any broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement who might be entitled to a fee or commission from Buyer or from the Company or any Company Subsidiary upon the consummation of the transactions contemplated hereby. Seller will indemnify and hold harmless Buyer, the Company and the Company Subsidiaries from and against any and all such claims for fees or commissions.

ARTICLE III

Representations and Warranties of Buyer

Buyer hereby represents and warrants as follows:

SECTION 3.1. Incorporation, Authorization, etc. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana. Buyer has full corporate power and is duly authorized to perform its obligations under and to consummate the transactions contemplated by this Agreement and the Escrow Agreement. The execution, delivery and performance of this Agreement will not violate any provision of the Amended Articles of Incorporation or By-Laws of Buyer or any provision of any mortgage, lien, lease, agreement, instrument, order, arbitration award, judgment or decree to which Buyer is a party or by which it is bound and will not violate or conflict with any other material restriction of any kind or character to which Buyer is subject, provided that Buyer shall be required to obtain waivers under certain of its debt agreements, which waivers shall be obtained prior to the Closing. This Agreement is, and when executed and delivered the Escrow Agreement will be, the legal, valid and binding agreements of Buyer, enforceable against Buyer in accordance with their terms. Other than in connection with or in compliance with the Hart-Scott-Rodino Act, no notice to, filing with or authorization, consent or approval of any public body or authority by Buyer is necessary for the consummation by Buyer of the transactions contemplated by this Agreement and the Escrow Agreement.

-26-

AM 000026

SECTION 3.2. _Investment_. Buyer is acquiring the Shares for its own account, for investment purposes only and not with a view to or for sale in connection with a distribution thereon within the meaning of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

SECTION 3.3. _Brokers, Finders, etc_. Buyer has not employed any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement who might be entitled to a fee or commission from Seller, Old Scovill or any of their affiliates upon the consummation of the transactions contemplated hereby. Buyer will indemnify and hold harmless Seller, Old Scovill and their affiliates from and against any and all such claims for fees and commissions.

## ARTICLE IV

### Survival of Representations and Warranties; Indemnity; Escrow

SECTION 4.1. _Survival_. The representations and warranties of Seller and Old Scovill included or provided for herein (except for the representations and warranties contained in Section 2.15 hereof), or in the Schedules or other instruments or agreements delivered or to be delivered pursuant hereto (except with respect to Section 2.15 hereof), shall survive the consummation of the Acquisition at the Closing until September 30, 1987, and the representations and warranties of Seller and Old Scovill included or provided for in Sections 2.15, 2.16(d), 2.20, 2.21 and 2.24 hereof (and the Schedules, instruments and agreements related thereto) shall survive until the expiration of the applicable statute of limitations with respect to claims made under or pursuant to such Sections (including, with respect to claims made under or pursuant to Section 2.15, until the expiration of the applicable statute of limitations with respect to all tax returns relating to the operations of the Company and the Company Subsidiaries for the periods referred to in such Section 2.15), in each case, regardless of any investigation made by or on behalf of any party hereto; _provided, however_, that, if prior to any of the foregoing dates, Seller shall have been notified of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, any representation or warranty which is the basis for such claim shall continue to survive and shall remain a basis for indemnity until such claim is finally resolved or disposed of.

-27-

AM 000027

SECTION 4.2. <u>Indemnity</u>. (a) After the Closing Date, Seller shall indemnify and hold harmless Buyer, the Company and the Company Subsidiaries, and their respective successors and assigns (the "Indemnified Parties"), from, against and in respect of any and all damages, deficiencies, costs, expenses or losses (collectively, the "Indemnified Liabilities") resulting from (i) any breach of any representation or warranty, covenant or agreement of Seller and/or Old Scovill, (ii) any lawsuit, action, administrative or arbitration or other proceeding or governmental investigation pending on the date hereof or arising out of events occurring on or prior to the Closing Date to the extent not reserved against on the Closing Balance Sheet, and (iii) any out-of-pocket costs in excess of $25,000 not reserved for on the Closing Balance Sheet incurred by Buyer, the Company or any Company Subsidiary relating to the reorganization of Old Scovill, Seller and their subsidiaries and/or divisions or the sale of any of their respective assets, including, without limitation, any costs relating to the separation of the assets of Schrader Bellows from the assets of the Company; <u>provided</u>, <u>however</u>, that Seller's obligation to indemnify and hold harmless the Indemnified Parties as set forth in this Section 4.2, (A) shall apply with respect to any representation or warranty, covenant or agreement of Seller and/or Old Scovill (except for those set forth in Sections 2.16(d), 2.20, 2.21, 2.24, 4.2(a)(iii), 5.3, 5.10 and 5.11 hereof), only if and to the extent the Indemnified Liabilities exceed an aggregate of $500,000, in which case Seller shall indemnify and hold harmless the Indemnified Parties from, against and in respect of all such amounts (in excess of the first $500,000), (B) shall apply only to claims for indemnity asserted (i) with respect to claims asserted pursuant to Section 2.15 hereof, within the applicable statute of limitations period with respect to the tax returns relating to the operations of the Company and the Company Subsidiaries for the periods referred to in such Section, and (ii) with respect to claims asserted pursuant to any other representation or warranty hereof (other than those in Sections 2.16(d), 2.20, 2.21 and 2.24 hereof), on or prior to September 30, 1987, and (C) shall not, with respect to the aggregate amount idemnified by Seller hereunder, exceed the Purchase Price.

(b) In computing the amount of any damage, deficiency, cost, expense or loss for which a claim of indemnification may be made pursuant to this Section 4.2, there shall be deducted an amount equal to the tax benefits, net of any taxes payable on indemnity received, if any, received by any of the Indemnified Parties in connection with such damage, deficiency, cost, expense or loss.

-28-

AM 000028

(c) The indemnification provisions set forth in this Section 4.2 are in addition to, and not in derogation of, the specific provisions for indemnification contained elsewhere herein (including in Sections 2.16(d), 2.20, 2.21, 2.24, 4.2(a)(iii), 5.3, 5.10 and 5.11 hereof).

SECTION 4.3.  <u>Indemnification Procedure</u>.  The Indemnified Parties shall notify Seller with reasonable promptness of their discovery of any matter giving rise to a claim of indemnity pursuant hereto.  With respect to any third party claim or action that could give rise to indemnity hereunder, Seller shall afford Buyer the opportunity to participate in the defense of such claim or action at Buyer's expense; <u>provided</u>, <u>however</u>, that if Seller shall not have assumed the defense of such matter after reasonable notice thereof, Buyer shall be entitled to appoint counsel, at Seller's expense. Except where Seller shall have failed to assume the defense of any such claim or action, counsel selected by Seller shall be lead counsel and shall have the final decision on all matters relating to the defense of the claim or action.  No claim or action subject hereto may be settled unless the Indemnified Parties, on the one hand, and Seller, on the other hand, consent thereto, which consent shall not be unreasonably withheld.  If, in any such third party claim or action, Seller is able to provide evidence reasonably satisfactory to Buyer of the willingness of the party prosecuting such claim or action to settle the matter for a sum certain (the "Settlement Amount"), and the Indemnified Parties refuse to consent to the settlement of such claim or action, then the maximum liability of Seller with respect to such claim or action shall be limited to the Settlement Amount, plus any damages, deficiencies, costs, expenses or losses incurred prior to the determination of the Settlement Amount.

SECTION 4.4.  <u>Escrow</u>.  (a)  Seller and Buyer agree that (i) an escrow fund shall be established pursuant to the terms and conditions contained in the Escrow Agreement substantially in the form of Exhibit A hereto, (ii) on the Closing Date, $1,000,000 of the Purchase Price shall be deposited with the Escrow Agent in accordance with the terms of the Escrow Agreement, and (iii) Buyer shall have the right to draw upon such escrow fund for the full amount of any damages, deficiencies, costs, expenses or losses indemnified by Seller pursuant to this Agreement in accordance with the terms of the Escrow Agreement.

(b)  The right of payment out of the escrow fund as provided for herein shall not preclude the Indemnified Parties from enforcing their rights to indemnity in any other

-29-

AM 000029

manner (provided that the Indemnified Parties first seek payment or relief for any claim out of available escrow funds).

## ARTICLE V

### Covenants

SECTION 5.1. Investigation of Business. Buyer may, prior to the Closing Date and through its own personnel, its independent accountants and its attorneys, make such investigation of the Company and the Company Subsidiaries, including, without limitation, the confirmation and/or other audit checks of cash and cash equivalents, inventories, receivables and liabilities, and the inspection of real and personal properties and equipment, as it deems necessary or advisable; provided, however, that such investigation shall not in any way release Seller or Old Scovill from its representations and warranties hereunder. Seller and Old Scovill agree to permit Buyer and its representatives to have, after the date of execution hereof, full access to the premises and to all the books, records and tax returns and related work papers of the Company and the Company Subsidiaries and to all the books and records of Seller and Old Scovill that relate to the Company and the Company Subsidiaries and to furnish Buyer with such financial and operating data and other information with respect to the business and properties of the Company and the Company Subsidiaries as Buyer shall from time to time request. In addition, Seller shall cause Deloitte Haskins & Sells to make its personnel, work papers and such other requested documentation relating to its work papers and to its reports on the books, records and tax returns and related work papers of the Company and the Company Subsidiaries, as is reasonably requested in connection with any such investigation, available to Buyer, its independent public accountants and its attorneys, during regular business hours. In the event of the termination of this Agreement, Buyer shall deliver to Seller all documents, work papers and other material obtained by Buyer or on its behalf from Seller as a result of this Agreement or in connection herewith, whether so obtained before or after the execution hereof, and, except with respect to the Company and the Company Subsidiaries after and subject to the Closing hereunder, will keep any information so obtained confidential in accordance with the terms and provisions of the letter agreement dated as of March 7, 1986 between Buyer and Seller (the "Confidentiality Agreement").

-30-

AM 000030

SECTION 5.2. <u>Obtaining Consents</u>. Buyer and Seller shall promptly file or cause to be filed with the Federal Trade Commission and the Antitrust Division of the United States Department of Justice any Notification and Report Forms and related material as may be required to be filed by the Hart-Scott-Rodino Act, shall use reasonable efforts to obtain a waiver from the applicable waiting period and shall promptly make any further filings pursuant thereto as may be necessary to further the consummation of the transactions contemplated hereby. Seller and Buyer shall also cooperate and use their best efforts, and Seller shall cause the Company and the Company Subsidiaries to cooperate and use their best efforts, to make all registrations, filings and applications, to give all notices and to obtain all governmental and other consents, transfers, approvals, orders, qualifications and waivers necessary or desirable for the consummation of the Acquisition (as such consents are listed in Schedule 2.9B), or which may thereafter be reasonably necessary or desirable in order to effect the transfer or renewal of any other licenses, approvals and authorizations; <u>provided</u>, <u>however</u>, that Buyer shall not be obligated to, or to agree to, take any action that in its reasonable judgment would be materially adverse to the business of Buyer and its subsidiaries or to the business of the Company and the Company Subsidiaries in order to obtain any such consent, transfer, approval, order, qualification or waiver.

SECTION 5.3. <u>Payment of Taxes</u>. Except as otherwise provided in Section 2.15 hereof, Seller agrees to pay all sales taxes, other property transfer taxes, all documentary or other stamp taxes and all other taxes, including but not limited to income and franchise taxes, if any, arising out of or relating to the sale and transfer of the Shares and the Balance as contemplated by this Agreement.

SECTION 5.4. <u>Further Assurances of Seller and Old Scovill</u>. (a) Each of Seller and Old Scovill agrees that, from time to time, whether at or after the Closing Date, it will execute and deliver such further instruments of conveyance and transfer and take such other action at Buyer's expense (with respect to out-of-pocket costs only) as Buyer may reasonably request to convey and transfer the Shares, the business of the Company and the Company Subsidiaries and the Balance to Buyer or, at Buyer's option in the case of the Balance, to the Company, more effectively. Subject to Section 2.15 hereof, each of Seller and Old Scovill agrees that it will provide Buyer with such books, records and tax materials and related work papers of or relating to the business and operations of the

-31-

AM 000031

Company and the Company Subsidiaries as may be necessary to prepare the tax returns of the Company and the Company Subsidiaries by the date upon which Seller delivers to Buyer the Closing Balance Sheet, and each of Seller and Old Scovill further agree that it will provide Buyer with such other available books, records and tax materials and related work papers as Buyer may reasonably request from time to time. Each of Seller and Old Scovill agrees that it will not take any action which will prevent or otherwise hinder its performance of this Agreement in accordance with the terms hereof.

(b) Each of Seller and Old Scovill agrees to cooperate with and, at Buyer's request, otherwise assist Buyer in the preparation of any additional financial statements which may be required to be filed by Buyer with the Securities and Exchange Commission pursuant to the federal securities laws and the rules and regulations promulgated thereunder as a result of the transactions contemplated hereby, provided that Buyer shall reimburse Seller for any out-of-pocket expense incurred by Seller in connection therewith.

SECTION 5.5. <u>Conduct of Business</u>. Prior to the Closing, except as otherwise consented to or approved by Buyer in writing and except as contemplated or permitted by this Agreement, including Schedule 5.5 hereto, each of Seller and Old Scovill covenants and agrees that:

(a) the Company shall operate its business and the businesses of the Company Subsidiaries in the ordinary and usual course and in good faith, consistent with past management practices;

(b) neither the Company nor any Company Subsidiary shall change or amend its certificate of incorporation (or comparable charter document) or by-laws;

(c) neither the Company nor any Company Subsidiary shall issue, sell or agree to issue or sell any shares of its capital stock of any class, or issue, sell or agree to issue or sell any securities convertible into, or options with respect to, or warrants to purchase or rights to subscribe to, any shares of its capital stock of any class;

(d) neither the Company nor any Company Subsidiary shall declare, pay or set aside for payment any dividend or other distribution in respect of its capital stock nor shall the Company or any Company Subsidiary, directly or indirectly,

-32-

AM 000032

redeem, purchase or otherwise acquire any shares of its capital stock, except to the extent of the net after tax earnings of the Company after the date hereof upon delivery to Buyer of a certificate of the chief financial officers of Seller and the Company as to the nature and amount of such dividend, distribution, redemption, purchase or acquisition;

(e) neither the Company nor any Company Subsidiary shall make any individual capital expenditure, or commitment with respect thereto (except with respect to expenditures relating to construction of an office building and a manufacturing warehouse both of which are currently under construction in Brazil), in excess of $50,000, or aggregate capital expenditures, or commitments with respect thereto, in excess of $500,000;

(f) neither the Company nor any Company Subsidiary shall incur, assume or guarantee any indebtedness for money borrowed (which for this purpose shall include nonrecourse borrowings); provided, however, that this Section 5.5(f) shall not prevent (i) any borrowing or advances between the Company and any Company Subsidiary or between any two Company Subsidiaries except borrowings or advances which may become subject to any contract, agreement, arrangement, license or permit of the type referred to in Section 2.12(e); or (ii) borrowings pursuant to the Canadian Imperial Bank of Commerce loan facility, provided that the aggregate amount of the borrowings pursuant to such loan facility shall not exceed $39,000,000;

(g) neither the Company nor any Company Subsidiary shall remove, transfer to Seller or others, or sell, or enter into any material contract with respect to, any properties or assets, other than sales in the ordinary course of business;

(h) neither the Company nor any Company Subsidiary shall grant any bonus or any increase in the rate of compensation or in the benefits payable or to become payable to any officer or other employee or to any agent or consultant over the levels in effect at December 31, 1985, other than increases required by union contracts or applicable law or increases payable to individuals whose annual level of compensation and benefits (after giving effect to such increase) is less than $50,000;

(i) except in the ordinary course of business, neither the Company nor any Company Subsidiary shall encumber or permit to become subject to any encumbrance any assets or properties or shall enter into any other material transaction or make any other material commitment; and

-33-

AM 000033

(j) the Company and the Company Subsidiaries shall maintain their corporate existence intact, except as permitted by this Agreement.

SECTION 5.6. _Preservation of Business_. Seller shall use its best efforts to preserve the business of the Company and the Company Subsidiaries intact, to keep available to the Company and Buyer the services of the officers and desirable employees of the Company and the Company Subsidiaries and to preserve the good will of customers, suppliers, advertisers and others having business relations with the Company and the Company Subsidiaries.

SECTION 5.7. _Escrow Agreement_. On or prior to the Closing Date, Seller shall enter into the Escrow Agreement substantially in the form attached hereto as Exhibit A.

SECTION 5.8. _Release_. Effective as of the Closing Date, Seller and Old Scovill unconditionally release each of the Company, its successors and assigns from any and all indemnity obligations arising out of the Transfer Agreement dated October 28, 1985 between Old Scovill and the Company (the "Transfer Agreement") in respect of which the Company is entitled to be indemnified hereunder.

SECTION 5.9. _Intercompany Accounts_. Within 30 days after the Closing Date, all intercompany accounts between the Company and the Company Subsidiaries on the one hand and Seller and its affiliates (other than the Company and the Company Subsidiaries) on the other hand will be settled in immediately available funds with interest from the Closing Date through the date of payment at the prime rate of The First National Bank of Boston as in effect from time to time.

SECTION 5.10. _Products Liability Claims_. (a) _Definition_. The term "Products Liability Claim" shall mean any claim alleging liability for any bodily injury to any individual or for any damage to property which is alleged to have arisen from possession, use, contact with, exposure to or on account of reliance upon a representation or warranty made with respect to any product.

(b) _Discontinued Products_. Seller shall be solely responsible for the defense, settlement and final disposition of any Products Liability Claim asserted against any of the Indemnified Parties which relates to personal injury or property damage occurring subsequent to the Closing with respect to any product once manufactured, distributed or sold by any

-34-

AM 000034

of Seller and its subsidiaries, affiliates, divisions and operations (including the Company and the Company Subsidiaries) but not of a type being manufactured, distributed or offered for sale by any of the Company and the Company Subsidiaries on the date of the Closing, whether or not such claim is asserted prior to Closing, except for claims ("Insured Foreign Claims") relating to any product manufactured, distributed or sold by, at or through the facilities of any foreign Company Subsidiary to the extent the Company receives payment or reimbursement with respect to such claims under an insurance policy of the Company or the Company Subsidiary in effect prior to the Closing and in full force and effect as of the Closing Date (excluding legal expenses, if any, not covered by such payment or reimbursement).

(c) <u>Occurrences Prior to Closing</u>. Seller shall be solely responsible for the defense, settlement and final disposition of any Products Liability Claim asserted against any of the Indemnified Parties (as defined in Section 4.2 hereof) which relates to personal injury or property damage occurring on or prior to the Closing with respect to any product manufactured, distributed or sold by any of Seller and its subsidiaries, affiliates, divisions and operations (including the Company and the Company Subsidiaries), whether or not such claim is asserted prior to Closing, except for Insured Foreign Claims.

(d) <u>Occurrences Subsequent to Closing</u>. Except as set forth in subsection (b) above, Buyer and the Company shall be solely responsible for the defense, settlement and final disposition of (i) any Products Liability Claim asserted against any of Seller and its subsidiaries, affiliates, divisions and operations (including the Company and the Company Subsidiaries) which relates to personal injury or property damage occurring subsequent to the Closing with respect to any product manufactured, distributed or sold by any of Seller and its subsidiaries, affiliates, divisions and operations, or the Indemnified Parties, and (ii) all Insured Foreign Claims.

(e) <u>Indemnification</u>.

(i) <u>Indemnification of Buyer</u>. The Products Liability Claims referred to in subsections (b) and (c) above are herein referred to as the "Seller Covered Claims." Seller shall indemnify and hold harmless each of the Indemnified Parties from, against and in respect of all losses, liabilities, indebtedness, damages, actions, causes of action, debts, dues, judgments, penalties, fines, costs, obligations,

-35-

AM 000035

expenses and fees (including all reasonable attorneys' fees and court costs) with respect to Seller Covered Claims. The foregoing indemnity by Seller shall supersede any prior assumption by the Company or any of the Company Subsidiaries of any Products Liability Claims with respect to products at any time manufactured, distributed or sold by the Company or any Company Subsidiary.

(ii) <u>Indemnification of Seller</u>. The Products Liability Claims referred to in subsection (d) above are herein referred to as the "Buyer Covered Claims." Buyer shall indemnify and hold harmless Seller and its subsidiaries, affiliates, divisions and operations from, against and in respect of all losses, liabilities, indebtedness, damages, actions, causes of action, debts, dues, judgments, penalties, fines, costs, obligations, expenses and fees (including all reasonable attorneys' fees and court costs) with respect to Buyer Covered Claims.

(f) <u>Indemnification Procedure</u>. The Indemnification procedures set forth in Section 4.3 hereof shall govern this Section 5.10.

SECTION 5.11. <u>Workers' Compensation Claims</u>. (a) <u>Conduct Prior to Closing</u>. Seller shall be solely responsible for the defense, settlement and final disposition of any claim asserted against any of the Indemnified Parties requesting compensation with respect to any bodily injury, disability or illness of any past or present employee of the Company or any Company Subsidiary which is alleged to have arisen out of any action, inaction or conduct which occurred prior to the Closing, whether or not such claim is asserted prior to Closing, except for claims ("Covered Foreign Claims") by or relating to any employee of any of the foreign Company Subsidiaries to the extent such claims are covered by any insurance policy of the Company or the Company Subsidiary in effect prior to the Closing and in full force and effect as of the Closing Date ("Seller Claims").

(b) <u>Conduct Subsequent to Closing</u>. Buyer and the Company shall be solely responsible for the defense, settlement and final disposition of (i) any claim asserted against any of Seller and its subsidiaries, affiliates, divisions and operations (including the Company and the Company Subsidiaries) requesting compensation with respect to any bodily injury, disability or illness of any past or present employee of the Company or any Company Subsidiary which is alleged to have arisen out of any action, inaction or conduct which oc-

-36-

AM 000036

112

curred subsequent to the Closing and (ii) all Covered Foreign Claims (collectively, "Buyer Claims").

    (c) <u>Indemnification</u>.

        (i) <u>Indemnification of Buyer</u>. Seller shall indemnify and hold harmless each of the Indemnified Parties from, against and in respect of all losses, liabilities, indebtedness, damages, actions, causes of action, debts, dues, judgments, penalties, fines, costs, obligations, expenses and fees (including all reasonable attorneys' fees and court costs) with respect to Seller Claims.

        (ii) <u>Indemnification of Seller</u>. Buyer shall indemnify and hold harmless Seller and its subsidiaries, affiliates, divisions and operations from, against and in respect of all losses, liabilities, indebtedness, damages, actions, causes of action, debts, dues, judgments, penalties, fines, costs, obligations, expenses and fees (including all reasonable attorneys' fees and court costs) with respect to Buyer Claims.

    (d) <u>Indemnification Procedure</u>. The indemnification procedures set forth in Section 4.3 hereof shall govern this Section 5.11.

    SECTION 5.12. <u>Mexican and Indian Operations</u>. Old Scovill agrees to, and Seller agrees that, from time to time after the date hereof, it will cause Old Scovill, and, where appropriate, any of its other affiliates, to use its best efforts to execute and deliver such instruments of conveyance and transfer and to take any such other action, in order to effect the transactions referred to in Exhibit F hereto relating to the operations of the Business in Mexico and India.

    SECTION 5.13. <u>Further Assurances of Buyer</u>. Buyer agrees that, from time to time after the date hereof, it will cooperate and use its best efforts to execute and deliver such agreements and to take any such other action as may be necessary, including entering into a new joint venture agreement or agreement in principle with Old Scovill's joint venture partners with respect to the operations of the Business in Mexico and India, in order to facilitate compliance with the covenant contained in Section 5.12 hereof in accordance with the procedures set forth in Exhibit F hereto.

    SECTION 5.14. <u>Maintenance of Insurance</u>. Seller and Old Scovill shall maintain or cause to be maintained in

-37-

AM 000037

full force and effect all of the Company's and the Company Subsidiaries' presently existing insurance coverage, or insurance comparable to such existing coverage, except that all such insurance coverage may be cancelled by the Company and the Company Subsidiaries as of the Closing Date.

SECTION 5.15. <u>Satisfaction of Closing Conditions</u>. Each of Buyer and Seller agrees to use its best efforts to satisfy all of the conditions to closing set forth in Articles VI, VII and VIII hereof, subject to the terms and conditions of this Agreement.

SECTION 5.16. <u>Change of Names</u>. As soon as reasonably practicable after the Closing Date, Buyer will cause each Company Subsidiary with the word "Scovill" as part of the legal name of such subsidiary to amend its charter to delete all references to the word "Scovill". As soon as reasonably practicable after the Closing Date, Buyer will cause the Company and the Company Subsidiaries to cease to use the name "Scovill" as part of any tradename or trademark used in the business of the Company and any Company Subsidiary.

SECTION 5.17. <u>Non-Competition Covenant</u>. Seller and Old Scovill agree that for a period of five years from the Closing Date they shall not, directly or indirectly, (i) engage in any business or acquire any financial or beneficial interest in any corporation, partnership, joint venture, trust or other entity that produces, manufactures, sells or otherwise deals with any of the products manufactured, sold or distributed by the Company or any Company Subsidiary or products similar thereto or competitive therewith; or (ii) offer employment to, or otherwise seek to engage the services of, any of the employees of the Company (other than (a) employees to whom Buyer does not offer employment prior to the date ending two months following the Closing Date, (b) employees who do not accept Buyer's offer of employment, provided that Seller receives prior written consent of Buyer to make any such offer; or (c) employees who seek employment with Seller without having been solicited to do so by Seller). Upon the Closing hereunder, Seller and Old Scovill agree, without any limit as to time, not to disclose to third parties any proprietary or confidential information previously used by them or then used by Buyer in the Business, except pursuant to agreements to which Seller or Old Scovill is a party on the date of this Agreement and extensions thereto or unless such information is otherwise publicly available or the release thereof is required by law. Seller, Old Scovill and Buyer

-38-

AM 000038

acknowledge that compliance with the agreements in this Section 5.17 is necessary to protect the business and other proprietary interests of the Company and Buyer and that a breach of any of the agreements in this Section 5.17 will result in irreparable and continuing damage to the Company and Buyer for which there will be no adequate remedy at law and Seller and Old Scovill agree that in the event of any breach of these agreements, the Company and Buyer shall be entitled to injunctive relief and to such other relief and further relief as may be proper.

## ARTICLE VI

### Conditions to Obligation to Close

SECTION 6.1.  Condition to Each Party's Obligations to Close.  The respective obligations of each party to proceed with the transactions contemplated hereunder and to close shall be subject to (i) all waiting period requirements having expired under the Hart-Scott-Rodino Act, (ii) Buyer, Seller and Escrow Agent each having entered into the Escrow Agreement substantially in the form attached hereto as Exhibit A, and (iii) there shall have been a closing of the purchase and sale contemplated by the Stock Purchase Agreement (as defined in Section 7.1(i) hereof).

## ARTICLE VII

### Conditions to Buyer's Obligation to Close

SECTION 7.1.  The obligation of Buyer to consummate the Acquistion is subject to the satisfaction on or prior to the Closing Date of all of the following conditions (any of which may be waived by Buyer):

(a)  Each of the representations and warranties of Seller and Old Scovill contained in this Agreement shall be true in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date, except for changes permitted or contemplated by this Agreement, each of the covenants and agreements of Seller and Old Scovill to be performed on or before the Closing Date shall have been duly performed in all material respects on or before such date, and Buyer shall have received at the Closing a certificate to that effect dated the Closing Date and executed on behalf of Seller and Old Scovill by authorized officers thereof.

-39-

AM 000039

(b)  Seller shall have furnished Buyer with:

(i)  copies of the certificate of incorporation (or comparable charter document) of the Company and each Company Subsidiary certified (where available) as of recent date by the Secretary of State (or comparable government official) of its jurisdiction of incorporation;

(ii)  copies of the By-laws and minute books of the Company and each Company Subsidiary, certified as of the Closing Date by its Secretary (where available); and

(iii)  certificates for all of the Shares and for the shares of capital stock or other equity interests (if applicable) in the Balance (subject to Section 5.12 hereof), with appropriate stock powers attached, properly signed, with the signature or signatures thereon guaranteed, together with evidence of payment of any applicable stock transfer taxes and together with the related stock books and stock transfer records of the Company.

(c)  The lessor under the lease dated May 4, 1984, between Mutual Life Insurance Company of New York and the Company relating to the lease of certain office space in Nashville, Tennessee shall have consented to the Acquisition, and Seller shall have provided Buyer with appropriate evidence of such consent.

(d)  Seller shall have delivered to Buyer a written opinion, dated the Closing Date, of Stewart S. Hudnut, Vice President and General Counsel of Seller, substantially in the form attached hereto as Exhibit B.

(e)  Seller shall have delivered to Buyer written opinions, dated the Closing Date, of Seller's General Counsel or counsel to the respective Company Subsidiary in each of France, South Africa, Brazil and Canada, (i) with respect to the Company Subsidiaries incorporated and doing business in each of France and South Africa, respectively, substantially to the effect of that attached hereto as Exhibit C-1, (ii) with respect to the Company Subsidiary incorporated and doing business in Brazil, substantially in the form attached hereto as Exhibit C-2, and (iii) with respect to the Company Subsidiary incorporated and doing business in Canada, substantially in the form attached hereto as Exhibit C-3, together with an accompanying certificate of Stewart S. Hudnut, Vice President and General Counsel of Seller, to the effect that such foreign counsel have served as counsel to the respec-

-40-

AM 000040

tive Company Subsidiary with respect to their respective
jurisdictions and that Buyer is justified in relying on such
foreign counsel's opinions.

(f)  Subject to Section 5.12 hereof, and except for
certain consents identified in Schedule 2.9B hereto as not
being closing conditions, all registrations, filings, appli-
cations, notices, transfers, consents, approvals, orders,
qualifications, waivers and other actions of any kind re-
quired of any governmental authorities or private agencies in
connection with the consummation of the Acquisition shall
have been made or obtained.

(g)  No order or injunction of any court or govern-
mental agency having jurisdiction shall be in effect which
prohibits the consummation of the Acquisition.

(h)  No action, suit or proceeding shall have been
instituted or threatened by any governmental agency or body,
before a court or governmental body, to restrain or prevent
the carrying out of the transactions contemplated by this
Agreement or which seeks other material relief with respect to
any of such transactions or which could reasonably be expected
to affect in a materially adverse manner the business, proper-
ties or affairs of Buyer or of the Company and the Company
Subsidiaries taken as a whole.

(i)  There shall have been no breach by First City
Trust Company, a corporation organized under the laws of
Alberta ("First City Trust"), or any of its affiliates, of the
Stock Purchase Agreement dated as of March 10, 1986 between
Buyer and First City Trust (the "Stock Purchase Agreement").

(j)  The operations of the Business in Mexico shall
have been transferred in accordance with Exhibit F hereto or
otherwise on terms mutually satisfactory to Buyer and Seller
or, if such transfer shall not have been consummated (in
which case the provisions of Section 5.12 hereof and Exhibit
F hereto shall apply), Old Scovill's joint venture partner
shall have executed and delivered to Buyer an agreement in
principle on terms no less favorable to Buyer than the terms
outlined in Exhibit F hereto with respect to such sale or
transfer.

(k)  Buyer shall have received a release or releases,
satisfactory to Buyer, of the full amount of the Company's
liability with respect to the Term Loan (as defined in Sec-
tion 8.1(d) hereof).

-41-

AM 000041

## ARTICLE VIII

### Conditions to Seller's Obligation to Close

SECTION 8.1. The obligation of Seller to consummate the Acquisition is subject to the satisfaction on or prior to the Closing Date of all of the following conditions (any of which may be waived by Seller):

(a) Each of the representations and warranties of Buyer contained in this Agreement shall be true on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date, each of the covenants and agreements of Buyer to be performed on or before the Closing Date shall have been duly performed on or before such date, and Seller shall have received at the Closing a certificate to that effect dated the Closing Date and executed on behalf of Buyer by an authorized officer of Buyer.

(b) Buyer shall have caused to be wired to Seller's bank account as designated by Seller immediately available funds in the total amount required to be paid pursuant to Section 1.1(c) hereof; Buyer shall have caused to be wired to the Escrow Agent's account as designated by the Escrow Agent immediately available funds in the total amount of $1,000,000.

(c) Buyer shall have delivered to Seller a written opinion, dated the Closing Date, of V. William Hunt, Vice President-Administration and General Counsel of Buyer, substantially in the form attached hereto as Exhibit D.

(d) Simultaneously with the Closing, Buyer shall cause the Company to repay (i) its term loan indebtedness (including all accrued interest thereon through the Closing Date) (the "Term Loan") to Canadian Imperial Bank of Commerce, and the group of lenders for which it acts as agent (collectively, the "CIBC Group") and (ii) its indebtedness and obligations to the CIBC Group under a working capital loan facility and letter of credit facility.

(e) Buyer shall have executed and delivered to Seller its guarantee (the "Guarantee"), substantially in the form attached hereto as Exhibit E, of the Company's obligations under the Transfer Agreement.

(f) Buyer shall have delivered to Seller a copy of the resolutions of Buyer's Board of Directors authorizing the

-42-

AM 000042

Acquisition, certified as of the Closing Date by Buyer's Secretary.

(g)  There shall have been no breach by Buyer of the Stock Purchase Agreement.

(h)  No order or injunction of any court or governmental agency having jurisdiction shall be in effect which prohibits the consummation of the Acquisition.

## ARTICLE IX

### Termination and Amendment

SECTION 9.1.  <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)  By mutual consent of Seller and Buyer;

(b)  By either Seller or Buyer if the Closing shall not have occurred on or before July 1, 1986; or

(c)  By Buyer if there shall have been a breach by First City Trust or any of its affiliates of the Stock Purchase Agreement.

SECTION 9.2.  <u>Effect of Termination</u>.  In the event this Agreement is terminated pursuant to Section 9.1 hereof, no party shall have any liability or further obligation hereunder (other than pursuant to the last sentence of Section 5.1 hereof) unless the termination was a result of such party's misrepresentation, breach of covenant, fraud, bad faith or willful misconduct.

SECTION 9.3.  <u>Amendment and Modification</u>.  Subject to applicable law, this Agreement may be amended, modified or supplemented only by written agreement of Seller and Buyer at any time prior to the Closing with respect to any of the terms contained herein.

## ARTICLE X

### Miscellaneous

SECTION 10.1.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall

-43-

AM 000043

be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.

SECTION 10.2. _Entire Agreement_. This Agreement and the Exhibits hereto, the Confidentiality Agreement and the Escrow Agreement contain the entire agreement among the parties with respect to the subject matter hereof and there are no agreements, understandings, representations or warranties between the parties other than those set forth or referred to in these agreements.

SECTION 10.3. _Expenses_. Except as set forth in this Agreement, all legal and other costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

SECTION 10.4. _Specific Performance_. Seller, Old Scovill and Buyer each acknowledge that, in view of the uniqueness of the business of the Company and the Company Subsidiaries, the parties hereto would not have an adequate remedy at law for money damages in the event that this Agreement were not performed in accordance with its terms, and therefore agree that each such party shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

SECTION 10.5. _Notices_. All notices hereunder shall be sufficiently given for all purposes hereunder if in writing and delivered personally or sent by registered mail or certified mail, return receipt requested, postage prepaid, to the appropriate address as set forth below. Notice to Seller shall be addressed to Scovill Inc., 500 Chase Parkway, Waterbury, Connecticut 06708, Attention: Stewart S. Hudnut, Esq. (with a copy to Weil, Gotshal & Manges, 767 Fifth Avenue, New York, New York 10153, Attention: Ted S. Waksman, Esq.), or to such other address and to the attention of such other person as Seller may designate by written notice to Buyer. Notices to Buyer shall be addressed to Arvin Industries, Inc., 1531 13th Street, Columbus, Indiana 47201, Attention: V. William Hunt, Esq. (with a copy to Wachtell, Lipton, Rosen & Katz, 299 Park Avenue, New York, New York 10171, Attention: Andrew R. Brownstein, Esq.), or to such other address and to the attention of such other person as Buyer may designate by written notice to Seller. Any notice shall be deemed to have been served or given as of the date such notice is personally delivered or three days after such notice is mailed.

-44-

AM 000044

SECTION 10.6.  Successors and Assigns.  This Agreement shall be freely assignable by Buyer to any of its wholly owned subsidiaries, and shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns; provided, however, that in the event Buyer assigns this Agreement to a wholly owned subsidiary of Buyer, Buyer shall remain liable with respect to all obligations assumed by Buyer pursuant to the terms of this Agreement.  Except as provided herein, Buyer will not assign its right to purchase the Shares under this Agreement without the prior written consent of Seller.

IN WITNESS WHEREOF, this Agreement has been signed by or on behalf of each of the parties hereto as of the day first above written.

ARVIN INDUSTRIES, INC.

By: _____

SCOVILL INC.,
   a Delaware corporation

By: _____

SCOVILL INC.,
   a Connecticut corporation

By: _____

-45-

AM 000045